**WIGHT, Admr., et al.**

v.

**OHIO STATE UNIVERSITY.** ▮

Court of Claims of Ohio.

No. 99–001624.

March 21, 2001.

*Thomas C. Schrader, Michele Smolin* and *Paul W. Linehan*, for plaintiffs.

*Sandra J. Anderson* and *Kimberly Weber Herlihy*, Special Counsel; *Betty D. Montgomery*, Attorney General, and *Randall W. Knutti*, Assistant Attorney General, for defendant.

J. WARREN BETTIS, Judge.

Plaintiffs brought this action against defendant setting forth claims for relief in wrongful death, survivorship, and funeral expenses.[1]  Defendant denied liability and the case was tried to the court on the sole issue of liability.

In the spring of 1997, plaintiffs' decedent, Shawn Wight, was a graduate student in defendant's geology department, wherein he volunteered to participate in a high-altitude expedition to the Dasuopu glacier in Tibet.  The forty-member expedition was a joint effort between defendant's Byrd Polar Research Center ("Byrd Center") and the Lanzhou Institute of Glaciology and Geocryology in Lanzhou, China.  Its mission was to retrieve ice core samples for analysis of global climate change.  The research team was led by Dr. Lonnie Thompson, a member of the Byrd Center, and Dr. Yao Tandong, a member of the Lanzhou Institute, both of whom were experienced high-altitude expedition leaders.

Prior to the expedition, Wight was instructed on the rigors of high-altitude climbing.  Wight received specific information about high-altitude illness from his co-workers, including Dr. Thompson and Mary Davis, a graduate student who had participated in several high-altitude expeditions, including a 1996 reconnais-

---

1.  Plaintiffs withdrew their claim for negligent infliction of emotional distress in their post-trial brief.

sance expedition to Dasuopu. Davis talked with Wight almost daily about her experiences at altitude and the mountain sickness she had experienced. Davis gave Wight a book entitled *Medicine for Mountaineering* that discusses the symptoms of various high altitude illnesses. Wight and his co-workers also listened to a radio program that had originally aired on May 30, 1997, and had featured medical experts discussing high-altitude illness and medicine.[2] Wight viewed a videotape and photographic slides that were taken during the 1996 expedition to Dasuopu. The 1996 expedition was also discussed at weekly meetings that Wight attended with Dr. Thompson and other co-workers.

On August 3, 1997, Dr. Thompson, Wight, Davis, and another graduate student, Keith Henderson, departed from Columbus, Ohio. The research team arrived two days later in Kathmandu, Nepal, where they stayed for approximately one week while waiting for the other expedition members to arrive. While in Kathmandu, Dr. Thompson hired local mountaineers, known as Sherpas, to act as guides and porters during the expedition. On August 11, 1997, the expedition began a three-day bus ride from Kathmandu, at an elevation of 4,500 feet, to the base camp at the Dasuopu glacier, at an elevation of 17,500 feet. The expedition team remained at base camp from August 14 to August 20, to allow them to acclimatize to the altitude. During their stay at base camp, all of the American members of the expedition experienced symptoms of altitude sickness. Wight's symptoms included headache, nausea, and loss of energy. After several days at base camp, Wight's condition improved, and he was ready to climb to the next camp.

On August 20, the research team hiked to an elevation of 19,000 feet where camp three, the advanced base camp, was established. Wight and the rest of the team remained at this elevation for thirteen days to continue the process of acclimatization. According to Dr. Thompson and Davis, after an initial period of sickness, Wight regained his appetite and resumed physical activities, such as hiking, looking for minerals, and helping out around the camp.

On September 2, the team moved to camp four, where they stayed for two nights at an elevation of 21,000 feet. Neither Dr. Thompson nor Davis was aware of any complaints by Wight at camp four. That evening, Wight wrote in his journal that he felt the best he had felt since arriving in China. On September 4, Wight and the other graduate students made their ascent to the drill site at camp five, at an elevation of 23,000 feet. Wight outpaced the other students during the climb and arrived at the drill site well ahead of his colleagues. During the second day at camp five, Wight helped to dig a snow pit that formed the base of the camp kitchen.

---

2. Dr. Peter Hackett, one of defendant's medical experts, participated in the radio program.

On September 6, while eating a late lunch in the kitchen, Wight's hands began to feel numb. A short time later, he became disoriented and had trouble remembering names. As soon as Dr. Thompson learned of Wight's condition, he determined that Wight needed to descend to a lower altitude. Drs. Yao and Thompson accompanied Wight to camp three, with a brief stop at camp four. Wight had had no trouble walking and had carried his own pack down from the drill site. By the time Wight arrived at camp three later that day, he had regained his memory. Although Wight stated that he felt "normal" the following morning and expressed a desire to return to the drill site, Dr. Thompson decided that Wight would remain at camp three for an additional five days before returning to camp five. Dr. Thompson arranged for two English-speaking field leaders from the Chinese team, Pu and Wang, to observe Wight. Pu and Wang were further instructed to take Wight to base camp if his memory problems recurred.

After Dr. Thompson returned to the drill site, he communicated with Wight through notes carried by expedition team members who frequently traveled between the camps. Initially, the notes received from Wight did not suggest that he was experiencing any health problems. However, on September 15, Dr. Thompson received a note informing him that Wight was suffering from pain under his ribs. A doctor from another expedition had examined Wight and concluded that the pain was probably caused by a kidney stone. Further, Wight stated that he intended to leave the expedition and that he needed money for hotel, travel and medical expenses. That same day, Dr. Yao delivered the traveling money to Wight. On September 16, Dr. Yao reported that Wight's condition was "serious" and suggested that Dr. Thompson descend to camp three and, from there, decide how to transport Wight, who was unable to walk because of a swollen leg.

Drs. Thompson and Yao decided to immediately evacuate Wight to a medical facility. Wight was carried by stretcher for eight miles to base camp where the expedition's vehicles were located. Wight, Dr. Thompson, Dr. Yao, and a driver traveled for a day and a half to First People's Hospital in Lhasa, Tibet.[3] On September 19, Wight was admitted to a wing of the hospital that was reserved for dignitaries. After several days at Lhasa, Wight's condition appeared to improve. Dr. Thompson then returned to the expedition and left Dr. Yao in charge of making the arrangements for Wight's travel back to the United States. It was expected that Wight would be released in four to five days.

---

3. Drs. Thompson and Yao concluded that this hospital was the closest hospital with adequate medical facilities. On the drive to Lhasa, the group stopped at a hospital in Xigaze where an x-ray of Wight was taken.

Some time after Dr. Thompson left Lhasa, Wight's father, plaintiff Brad Wight, telephoned the hospital. After speaking with his son, Wight's father informed Dr. Yao that he would arrange for Wight's return travel. With Dr. Yao's help, Brad Wight had his son flown to Hong Kong where he was hospitalized for an additional ten days. Although the hospital medical staff determined that Wight had a lung abscess that needed to be drained, he was discharged against the advice of the Hong Kong doctors. On October 8, Wight arrived in Cleveland and was admitted to University Hospital of Cleveland ("UHC").

Wight remained hospitalized at UHC for several weeks while doctors treated his lung infection. Initially, a chest tube was placed for drainage and antibiotics were administered to battle the infection. After several days, Wight's doctors determined that surgical intervention was necessary to remove the infected portion of his lung. Wight was continued on antibiotics after the operation and his condition improved. On October 31, Wight was discharged from UHC with the expectation that he would fully recover.

Two days after his release, Wight's condition suddenly worsened and he was readmitted to UHC. Despite the surgical and antibiotic therapy, Wight's lung infection had not been eradicated. On November 28, 1997, Wight died as a result of complications from his lung infection.

■ Each of plaintiffs' claims is based upon defendant's alleged negligence. In order for plaintiffs to prevail upon these claims, they must prove by a preponderance of the evidence that defendant owed plaintiffs' decedent a duty, that it breached that duty, and that the breach proximately caused the death of plaintiffs' decedent. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 285, 21 O.O.3d 177, 179, 423 N.E.2d 467, 469; *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 679–680, 693 N.E.2d 271, 273–274.

Plaintiffs first claim that Dr. Thompson failed to properly monitor Wight's condition during the expedition and that this inattention resulted in Wight's worsening condition and, ultimately, his death. Defendant does not dispute that it owed certain duties to Wight and that Dr. Thompson, as a leader of the expedition, was generally responsible for the health, welfare, and safety of the participants. However, defendant maintains that Dr. Thompson acted swiftly and reasonably once he was aware that Wight was experiencing unusual symptoms that were not associated with altitude sickness.

The testimony of all of the expert witnesses was consistent regarding the symptoms and occurrence of altitude mountain sickness ("AMS")[4] in climbers who have not acclimatized to the atmospheric changes associated with an ascent

---

4. "Altitude mountain sickness" is also known as "acute mountain sickness."

to high altitude. The symptoms of AMS are a consequence of hypoxia, a condition resulting from insufficient oxygen supplied to or utilized by body tissue. Above 8,000 feet, when climbers ascend too rapidly, they are likely to develop AMS and experience symptoms that are not unlike a "bad hangover." The symptoms of AMS include nausea, insomnia, shortness of breath, fatigue, and severe headaches.

In addition to AMS, other more serious illnesses that occur at high altitude include high altitude cerebral edema ("HACE") and high altitude pulmonary edema ("HAPE"). Like AMS, HACE is a neurological disease that can cause nausea and lethargy. HACE results from swelling of the brain that creates pressure against the skull and spine. HAPE is caused by leaking blood vessels that allow fluid to fill the lungs.

The symptoms of AMS, HACE, or HAPE can be minimized by administering medications or supplemental oxygen. HAPE or HACE can also be treated by the use of a "Gamow bag," a device that increases the relative atmospheric pressure for its user. However, all of the experts agreed that descent to a lower altitude is preferable to any medication or device and that the best way to prevent any type of altitude sickness is for climbers to spend an adequate amount of time acclimatizing to high altitude before further ascent.

Plaintiffs' expert, Charles Houston, M.D., testified that climbers become acclimatized to high altitude at different rates. Dr. Houston opined that, according to Wight's diary entries and statements made by expedition members, Wight was not acclimatizing well during his time on the glacier. According to Dr. Houston, although Wight's condition improved after his initial illness, he suffered a relapse when he continued to climb and exert himself. Dr. Houston concluded that Wight's confusion and memory loss at the drill site were the result of HACE.

Dr. Houston testified that Dr. Thompson acted promptly when he recognized that Wight's memory problems might be symptoms of HACE and decided thereupon to take him down to camp three. However, Dr. Houston opined that Wight did not descend low enough to allow full recovery. In Dr. Houston's opinion, Wight was not adequately monitored at camp three. Dr. Houston believed that Wight became inactive and dehydrated and that these conditions resulted in the formation of a blood clot in his leg, which eventually migrated to his lung. Dr. Houston testified that the blood clot in Wight's lung provided a medium for the infection and the pulmonary embolism that eventually caused his death.

In contrast to Dr. Houston's opinion, defendant offered the expert testimony of Peter Hackett, M.D. According to Dr. Hackett, Wight's memory problems at camp five were caused by a focal neurological event, or transient ischemic attack, that is caused by an interruption of the blood flow to the brain, similar to a

migraine. Dr. Hackett testified that medical publications are replete with case studies of climbers who have experienced focal neurologic events at altitude after becoming acclimatized. Hackett explained that the case studies report symptoms that include speech and sight impairment, migraine headaches, amnesia and numbness. In many of the reported cases, the symptoms would be resolved after the climber descended to a lower altitude, and subsequent tests would then confirm that the symptoms were not caused by the edema associated with a diagnosis of HAPE or HACE.

Dr. Hackett disputed Dr. Houston's opinion that Wight developed HACE while working at the drill site. Dr. Hackett was of the opinion that Wight had become well acclimatized by the time he had reached the camp five drill site. According to Dr. Hackett, HACE does not develop suddenly after a climber has become acclimatized. Dr. Hackett testified that the hallmark of HACE in an individual with either AMS or HAPE is a loss of coordination, or ataxia, together with altered consciousness. In Dr. Hackett's opinion, Wight did not suffer from AMS or HAPE and he was not having trouble with his coordination either before or during the time he was evacuated from the drill site. Dr. Hackett emphasized that a diagnosis of HACE could not be made without an observation of ataxia and that all the information he had reviewed established that Wight was not ataxic.

With regard to the proper course of treatment for Wight's memory problems, Dr. Hackett agreed with Dr. Houston's assessment that the appropriate response to Wight's medical condition was to evacuate him to a lower altitude. However, Dr. Hackett believed that it was reasonable for Wight to remain at camp three rather than to descend lower. Dr. Hackett testified that the symptoms of either HACE or a focal neurological event generally resolve after descending a few thousand feet. Dr. Hackett noted that Wight had improved by the time he had arrived at camp four, that his symptoms were almost completely resolved when he arrived at camp three, and that he felt "normal" the next morning.

With regard to Wight's swollen leg, Dr. Hackett testified that Wight developed signs of deep venous thrombosis ("DVT") nine or ten days after he had descended to camp three. Dr. Hackett explained that DVT is essentially a blood clot that forms in a vein. Although Dr. Hackett agreed with Dr. Houston's opinion that dehydration, inactivity, and thickened blood that results from being at high altitude are predisposing factors, he testified that the occurrence of DVT at altitude is "totally unpredictable." Dr. Hackett further testified that there was no causal relationship between the focal neurological event and DVT. Dr. Hackett stated that he believed Dr. Thompson responded immediately and responsibly after being advised of Wight's swollen leg and that Dr. Thompson's response was "exactly what [he] would have done."

■ The court finds that the testimony and evidence support defendant's assertion that Dr. Thompson acted decisively and reasonably when he became aware that Wight was experiencing symptoms that were potentially serious. With respect to Wight's memory loss at the drill site, even Dr. Houston testified that Dr. Thompson acted promptly and effectively when he suspected that Wight's memory lapse might indicate a serious medical problem.

Although plaintiffs assert that Dr. Thompson did not properly monitor Wight's condition at camp three, plaintiffs' own expert testified that Dr. Thompson had reason to believe Wight was adequately attended to at the camp. On September 7, the day after Wight returned to camp three after suffering memory problems, he awoke and informed Dr. Thompson that he felt "normal" and wanted to return to the drill site. Instead, Dr. Thompson arranged for two expedition members, Pu and Wang, to watch Wight while he remained at camp three for at least five days. Dr. Thompson's testimony established that, at all times during Wight's stay at camp three, between ten to thirty expedition members occupied the camp. Wight's journal entries and notes written to his colleagues also show that he frequently interacted with the expedition members and other mountaineers who traveled through the camp. The court finds that plaintiffs' assertion that Wight was left alone and not properly monitored at camp three is not supported by the evidence.

The court also finds that Dr. Thompson's decision to have Wight remain at camp three rather than descend to base camp was reasonable under the circumstances. Dr. Thompson determined that Wight should remain at camp three because there was daily communication between that camp and the drill site. Furthermore, an additional day of travel was required to reach the base camp, and it was staffed only by truck drivers and mechanics who did not speak English. Dr. Thompson instructed Wang and Pu that Wight should be evacuated to base camp in the event that he had a relapse of the symptoms that were observed at camp five. Moreover, the evidence demonstrates that there was no reason to descend further than camp three because Wight's memory problem cleared up. Indeed, Dr. Houston testified that it would be speculation to assert that Wight would have fully recovered if he had descended lower.

With regard to Dr. Thompson's knowledge that Wight had become seriously ill, the notes that Wight sent to his colleagues at camp five did not contain any complaints of a worsening medical condition. Both Dr. Thompson and Davis testified that Wight's correspondence did not reference any complaints of discomfort or problems with sleeping and eating that were contained in his journal. Although the court has no reason to doubt the accuracy of the statements contained in the journal, it is undisputed that Wight did not share his journal with other expedition team members. The court notes that plaintiffs' expert, Dr.

Houston, based much of his opinion about Wight's condition upon information that was contained in Wight's personal journal. However, Dr. Thompson could only take action with respect to Wight's medical problems if he were aware of them.

Dr. Thompson first learned of Wight's worsening condition on September 15 when he received Wight's note that requested money for travel. The next day, after receiving news of Wight's swollen leg, Dr. Thompson immediately descended to camp three and prepared for Wight's evacuation to a medical facility. Dr. Hackett and a professional mountaineer, Peter Athans, both testified that DVT is a highly unusual and unpredictable condition for a climber to develop. The court finds that Dr. Thompson reacted swiftly and decisively once he knew of Wight's serious condition.

The court further finds no merit in plaintiffs' claims that defendant was negligent for failing to treat Wight with medication or to use a Gamow bag. Plaintiffs failed to prove that either prescription medication, such as Diamox, or a Gamow bag would have improved Wight's condition. Plaintiffs' expert agreed that neither prescription medication nor a Gamow bag was preferable to having Wight descend to a lower altitude. Furthermore, since the court finds that Wight was fully acclimatized before his memory lapse occurred and that he was evacuated in an expeditious manner, it is unlikely that the alternative measures for treating hypoxia would have benefited him.

Plaintiffs also failed to prove that Dr. Thompson was negligent for evacuating Wight to Lhasa, Tibet rather than Kathmandu, Nepal. Plaintiffs' claim in this regard is based upon the fact that the linear distance between the camp site and Kathmandu is significantly less than the distance between the camp and Lhasa. However, all of the witnesses who are familiar with the region testified that, considering the road conditions and mountainous terrain, the decision to seek medical assistance in Lhasa was the more reasonable. Dr. Thompson also explained that he and Dr. Yao did not have documentation to allow them to return to the expedition in China if they had crossed the border into Nepal. According to Dr. Thompson, Wight participated in the travel planning discussion and agreed with the decision to seek medical treatment in Lhasa. The court finds that Dr. Thompson acted with the proper degree of care in responding to Wight's medical emergency and that plaintiffs have failed to prove any negligence on the part of defendant concerning the choice of medical facilities.

Based upon the expert testimony and the evidence, the court finds that Dr. Thompson performed his duties as a leader of the expedition in a reasonable manner. Accordingly, the court finds that plaintiffs have failed to prove that defendant breached a duty owed to Wight.

Nonetheless, even if plaintiffs had established that defendant breached a duty owed to Wight, there is no legal consequence for the breach of such a duty unless it is the proximate cause of an injury. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 411–412, 504 N.E.2d 19, 21. The only testimony that plaintiffs presented as to the cause of Wight's death came from Dr. Houston, who concluded that Wight did not properly acclimatize to high altitude and that his resulting altitude sickness contributed to the formation of blood clots that made him susceptible to the infection that caused his death. However, Dr. Houston testified that he did not review Wight's medical records from UHC, where Wight was hospitalized for the last eight weeks of his life.

It is undisputed that the bacteria that caused Wight's lung infection, alcaligenes xylosoxidans, is an uncommon cause of disease. The bacteria was first identified as the cause of Wight's lung infection in a culture that was performed at UHC. During his stay at UHC, Wight underwent two surgical procedures and was treated with antibiotics to combat the lung infection. The court finds that Dr. Houston could not fully understand the cause of Wight's death without a review of the UHC records.

Dr. Houston did rely on the death certificate from UHC in forming his opinion concerning the cause of Wight's death. However, the cause of death listed on the death certificate is not consistent with Dr. Houston's opinion. The death certificate shows respiratory failure as a consequence of "a. xylosoxidans pneumonia" and "pulmonary embolism" as the immediate cause of death. The death certificate also listed AMS (HAPE) as another "significant condition * * * contributing to death *but not resulting in the underlying cause*" (emphasis added) of Wight's death.[5] Dr. Houston specifically disagreed with the conclusion that Wight had developed HAPE and, as noted above, he did not review any of the UHC records that discussed the diagnosis and treatment of the infection caused by the bacteria that was identified at the hospital. The court finds that the death certificate does not support plaintiffs' theory regarding the proximate cause of Wight's death and, in some respects, conflicts with that theory. Accordingly, the court concludes that plaintiffs have failed to prove that defendant's alleged negligence proximately caused Wight's death.

For the foregoing reasons, judgment shall be rendered in favor of defendant.

*Judgment for defendant.*

J. WARREN BETTIS, J., retired, of the Columbiana County Court of Common Pleas, sitting by assignment.

---

5. DVT is also listed as a significant contributing factor; however, the Hong Kong hospital discharge summary establishes that the DVT had resolved before Wight arrived at UHC.